In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-1559

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JACEK RADZISZEWSKI,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 1200—**Wayne R. Andersen**, *Judge.*

ARGUED SEPTEMBER 27, 2006—DECIDED JANUARY 24, 2007

Before POSNER, MANION, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* After a seven-day trial, a jury convicted Jacek Radziszewski of committing mail and wire fraud in connection with a scheme to obtain real estate loans through false representations. On appeal, Radziszewski challenges the sufficiency of the evidence, the district court's exclusion of one of his proffered good-faith defenses, and his sentence. As detailed below, we find that the evidence was sufficient to support Radziszewski's conviction, and that the court's exclusion of Radziszewski's good-faith argument relating to the repayment of the loans was proper. Finally, the district court's factual findings at sentencing, which resulted in enhancements for the defendant's role in the offense and

the use of stolen identification, were not clearly erroneous. Accordingly, we affirm.

## I.  BACKGROUND

In April 2004, Radziszewski and two associates, Kuba Jasny and Andrzej Filipowicz, were indicted for using the mail and wires in connection with a scheme to defraud lending institutions of real estate loans in violation of 18 U.S.C. §§ 1341 and 1343. They were charged with paying individuals with good credit histories to pose as buyers of properties in Chicago and supplying false documentation to support the loan applications of the straw buyers. According to the indictment, in August 2003, Radziszewski and Jasny successfully orchestrated a straw buyer's purchase of a building located at 631 North Central Park ("the North Central Park Property"), which was financed by Rose Mortgage.[1] Count One concerned a wire transfer resulting from the subsequent assignment of the loan to Washington Mutual Bank.

Further, the indictment alleged that in December 2003, Radziszewski and Jasny attempted to resell the North Central Park Property by asking co-defendant Filipowicz to purchase the property using the name "Marian Plewa" and to apply for a home loan from National City Mortgage. Count Two charged Radziszewski, Jasny, and Filipowicz with causing the interstate mailing of several documents, including a fraudulent loan application for the North Central Park Property bearing the name "Marian Plewa."

---

[1]  Count One of the indictment also alleged that in August 2003, Radziszewski assisted in a similar fraud involving a building at 917 North Ridgeway in Chicago. Because the indictment and evidence at trial related primarily to the North Central Park Property, that property is the focus of our discussion.

Before trial, both Jasny and Filipowicz entered guilty pleas, and Radziszewski moved to dismiss Count One. Radziszewski contended that he could not have formed the requisite intent to defraud both lenders involved in financing the August and December purchases of the North Central Park Property. He noted that Washington Mutual Bank, the lender who financed the August transaction, was to be repaid with proceeds obtained upon the December resale of the property. As a consequence, Radziszewski maintained that he could not have intended to deprive Washington Mutual Bank of funds, because that lender would ultimately be reimbursed. The district court rejected Radziszewski's argument, and the case proceeded to trial.

Several participants in the scheme testified at trial. Ryszard Rutkowski, a Polish immigrant who could not read, speak, or write in English, under a grant of immunity, testified that he purchased the North Central Park Property at Radziszewski's direction in January 2003. Although the home was purchased in Rutkowski's name, he stated that he did not provide any information for his loan application. After the purchase, Rutkowski assisted in making repairs to the building, and Radziszewski paid Rutkowski $2000 for the use of his name.

In August 2003, Rutkowski sold the North Central Park Property to Andrij Kripatskyy, an immigrant, who, like Rutkowski, could neither read nor write in English. At trial, Kripatskyy acknowledged that he came to the United States from Ukraine on a tourist visa and overstayed his period of authorization. Kripatskyy testified that he met the defendant after responding to an advertisement stating that persons with good credit could earn money in real estate without investing their own money. In July 2003, Radziszewski took Kripatskyy to a mortgage broker to sign forms required to obtain a loan. The broker testified that Radziszewski paid him $4000 to

ensure that the loan was approved; Kripatskyy received $8000 for his cooperation. As Kripatskyy sat silently, the defendant filled out forms in support of the loan and directed Kripatskyy to sign the forms without translation. Among other things, Kripatskyy signed a loan application in which the defendant falsely represented that Kripatskyy worked at a company called Best Investments and earned $70,000 a year. Additionally, the defendant produced fake W-2s and bank account statements, and a false appraisal, which inflated the value of the property to $297,000 (approximately $100,000 more than its actual value). The appraisal bore the signature of licensed appraiser Bill Nold. However, Nold testified that although he had appraised the property, he had actually valued the home somewhere between $191,000 and $203,000 and that the higher appraisal was a forgery.

An underwriter for the lender, Rose Mortgage Company, testified that, relying on the false employment information, account statements, and appraisal, she approved the $237,600 loan issued to Kripatskyy, which enabled him to purchase the North Central Park Property in August 2003. At closing, Radziszewski told both Rutkowski (the purported seller) and Kripatskyy (the straw buyer) what and where to sign, as neither individual could read the English documents. Rutkowski, Kripatskyy, and Radziszewski were also informed that Rose Mortgage Company would be assigning the loan to Washington Mutual Bank.

By November, Radziszewski had begun preparations for the December resale of the North Central Park Property to co-defendant Andrzej Filipowicz for $349,000. Like the previous straw buyers, Filipowicz spoke little English. To procure a $279,000 loan from National City Mortgage, the defendant took Filipowicz to meet a National City Mortgage broker on two occasions. Before each meeting with the broker, Radziszewski provided Filipowicz with

a driver's license bearing the name "Marian Plewa," in whose name the property was to be purchased. The driver's license displayed the social security number belonging to the real Marian Plewa, a resident of Palos Park, Illinois, who had not authorized the use of his personal information. Additionally, the defendant supplied the broker with fraudulent documents, including fake bank statements, pay stubs, and a fake appraisal valuing the property at $300,000. During the meetings, Radziszewski instructed Filipowicz to sign various documents without translating them into English. Filipowicz was promised that a $5000 debt he owed to one of Radziszewski's associates would be forgiven in exchange for his participation in the scheme.

On December 22, 2003, Jasny took Kripatskyy (purported seller) and Filipowicz (straw buyer) to the closing. By that time, based on a bank's discovery that the account number and balance provided on the loan application did not correspond to a "Marian Plewa," the Federal Bureau of Investigation (FBI) had learned of the scheme. After the parties completed their transaction, they were arrested. Radziszewski, who did not attend the closing, was arrested at a later date. At that time, he possessed a host of items linking him to the scheme, including cell phones used to call Filipowicz before the December closing, the contact information for real estate appraiser Bill Nold, and papers showing that he owned Illinois Best Investments, the purported employer of Kripatskyy and Filipowicz.

A jury found the defendant guilty on both counts. The district court sentenced the defendant to 33 months' imprisonment based on a loss amount of $115,979, the defendant's role as a leader in the criminal activity, and the unauthorized use of stolen identification during the

offense.[2] The defendant now appeals both his conviction and sentence.

## II.  ANALYSIS

### A.  Sufficiency of the Evidence

Radziszewski first challenges the sufficiency of the evidence in support of his mail and wire fraud convictions. When faced with such a challenge, we will only reverse a defendant's conviction if, viewing all evidence in the light most favorable to the government, no rational trier of fact could have found the defendant guilty of the charges beyond a reasonable doubt. *United States v. Olson*, 450 F.3d 655, 664 (7th Cir. 2006). To prove mail or wire fraud, the prosecution must demonstrate: "(1) the defendant's participation in a scheme to defraud; (2) the defendant's intent to defraud; and (3) the defendant's use of the mail (for 18 U.S.C. § 1341) or wires (for 18 U.S.C. § 1343) in furtherance of the fraudulent scheme." *United States v. Davuluri*, 239 F.3d 902, 906 (7th Cir. 2001). Radziszewski does not dispute the existence of a scheme to defraud lenders, he simply disclaims any intentional participation in that scheme by portraying himself as an innocent translator or mere associate of those involved in the scheme.

The evidence at trial, however, demonstrated that Radziszewski was not just a knowing participant, but a leader in the scheme. According to trial testimony, Radziszewski selected straw buyers based on their credit histories, took them to meetings with mortgage brokers, supplied the brokers with the critical documents

---

[2] The district court consulted the 2004 edition of the United States Sentencing Guidelines Manual (Guidelines or U.S.S.G.) in sentencing Radziszewski.

for obtaining loan approval, told the buyers where to sign forms, bribed a broker to increase the probability of loan approval, and even provided a straw buyer the identification required to assume a stolen identity. Further, the documentary evidence showed that funds gained at the August closing were deposited into an account in the defendant's control.

The defendant urges us to discount this mountain of evidence by impugning the credibility of the trial witnesses. For instance, he argues that Kripatskyy's testimony cannot be trusted because Kripatskyy was an illegal alien, testified under a grant of immunity, and made seemingly inconsistent statements regarding Radziszewski's participation in the scheme. But "[i]t is not our role, when reviewing the sufficiency of the evidence, to second-guess a jury's credibility determinations." *United States v. Buchmeier*, 255 F.3d 415, 420 (7th Cir. 2001) (quoting *United States v. McGee*, 189 F.3d 626, 630 (7th Cir. 1999)). Accordingly, "we reverse [credibility] determinations on appeal only under exceptional circumstances, such as 'where it was physically impossible for the witness to observe that which he claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all.'" *United States v. Ray*, 238 F.3d 828, 834 (7th Cir. 2001) (quoting *United States v. Williams*, 216 F.3d 611, 614 (7th Cir. 2000)). Radziszewski does not contend that this case presents any such exceptional circumstance. And, we decline Radziszewski's invitation to reweigh the credibility of the trial witnesses and affirm the jury's verdict.

**B. Good-Faith Defense**

The defendant next complains that the district court improperly excluded his good-faith defense. We review a district court's evidentiary rulings, such as a decision to

exclude a particular theory of defense, for abuse of discretion. *See United States v. Lamarre*, 248 F.3d 642, 646-47 (7th Cir. 2001).

Radziszewski initially contends that the district court erred in preventing him from arguing that "it would be legally impossible to form the required specific intent to defraud both Washington Mutual and National City Mortgage in the same scheme . . . because Washington Mutual would have been paid out of the proceeds from National City . . . ." We are not persuaded. It is well settled that a defendant's ultimate intention to pay off a debt obtained fraudulently is irrelevant to the intent to obtain the money through deceptive means. *See United States v. Masquelier*, 210 F.3d 756, 759 (7th Cir. 2000) (The defendant's "ultimate intention to make good on the contract is irrelevant to his intent to obtain government money to which he was not entitled through deceptive means. . . . Fraud is complete when the defendant obtains money by false pretenses."). Here, the fraud against Washington Mutual Bank was complete in August 2003, and Radziszewski's intention to repay Washington Mutual Bank four months later can undo neither the fraud nor injury caused by wrongly depriving Washington Mutual Bank of its funds from August until December. Therefore, the trial court properly excluded this defense.

The defendant further alleges that he was precluded from presenting other good-faith defenses, but he misrepresents the record. The trial court's ruling was limited to Radziszewski's argument that his intent to repay Washington Mutual Bank somehow negated any intent to defraud. Indeed, the court permitted the defendant to invoke other good-faith arguments, including his argument that he acted as an innocent translator and that other parties were responsible for any fraud.

**C. The District Court's Loss Calculation**

Radziszewski also challenges his sentence, arguing that the court relied on incorrect loss calculations. Because loss calculations are reviewed for clear error, *see United States v. Wasz*, 450 F.3d 720, 726 (7th Cir. 2006), we will only reverse if we are left with "a definite and firm conviction that a mistake has been made." *United States v. Schaefer*, 384 F.3d 326, 331 (7th Cir. 2004) (internal quotation marks and citations omitted).

The Guidelines range applicable here depends on the actual and intended loss due to Radziszewski's fraud. *United States v. Lane*, 323 F.3d 568, 585 (7th Cir. 2003). Actual loss is "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i). By contrast, intended loss "(I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur . . . ." U.S.S.G. § 2B1.1 cmt. n.3(A)(ii). The district court was only required to make "a reasonable estimate of the loss." *See* U.S.S.G. § 2B1.1 cmt. n.3(C). And, given the district court's "unique position to assess the evidence and estimate the loss based on that evidence," its loss calculations are due a degree of deference. *Id.* To succeed in his appeal, then, the defendant must show that the court's loss calculations "[were] not only inaccurate but outside the realm of permissible computations." *United States v. Lopez*, 222 F.3d 428, 437 (7th Cir. 2000) (quoting *United States v. Hassan*, 211 F.3d 380, 383 (7th Cir. 2000)).

The district court arrived at an actual loss amount of $115,979 and an intended loss of $108,500. As directed by Application Note 3(A) to § 2B1.1 of the Guidelines, the court adopted the larger value (i.e., the actual loss amount) as its loss calculation. Because that figure fell between $70,000 and $120,000, the district court increased

the defendant's offense level by eight. *See* U.S.S.G. § 2B1.1(b)(1). To sustain the district court's eight-level increase, we need only conclude that the loss amount exceeded $70,000. *See id.* So, if the district court calculated either the actual or intended loss amount correctly (both of which exceeded $70,000), we will affirm.

We begin by examining the district court's actual loss calculation. The court arrived at its actual loss amount by accepting Washington Mutual Bank's representation that it sustained $115,979 in losses on the $237,600 loan it issued in August 2003. Although Washington Mutual Bank recouped $170,500 from the foreclosure sale of the property, its loss calculation included interest charges and attorney's fees. Radziszewski objected to the actual loss amount because Washington Mutual Bank did not itemize its losses, thereby making it virtually impossible for him to dispute the loss calculation. Although Radziszewski makes a compelling argument that the district court's wholesale adoption of Washington Mutual Bank's actual loss figure, without testing the accuracy of that figure, could have resulted in an inflated loss amount, we affirm because the district court's intended loss calculation, which also exceeded the $70,000 threshold, was not clearly erroneous.

The district court arrived at the $108,500 intended loss amount by deducting the price realized upon foreclosure of the North Central Park Property ($170,500) from the amount of the loan that National City Mortgage intended to issue for the December 2003 purchase ($279,000). Radziszewski argues that the intended loss amount should have been based on the highest April 2003 appraisal of the home ($203,000) and an assumption that the home appreciated at a rate of 1% per month. Based on Radziszewski's assumptions, he arrives at an intended loss of $60,200. The flaw with the defendant's argument is that he cannot show that his loss estimate is based on a

superior measure of the property's value in December 2003. Indeed, the defendant's intended loss calculation depends on two speculative values—an appraised value of the home and an estimated rate of appreciation. There was no error in the district court's decision to base its loss calculation on a certain figure (the price realized on foreclosure) rather than a sum ascertained by conjecture. *Cf.* U.S.S.G. § 2B1.1 cmt. n.3(E) (stating that in cases involving collateral, a victim's loss calculation should be reduced by the amount the victim *actually* recovered from the disposition of collateral). Because the district court's intended loss calculation exceeded the $70,000 threshold, we affirm the court's eight-level increase.

### D.  The Role in the Offense and Use of Stolen Identity Enhancements

Finally, the defendant argues that the district court erred in applying enhancements for an "aggravating role" (as a leader or an organizer) under U.S.S.G. § 3B1.1 and for using a stolen identity under U.S.S.G. § 2B1.1(b)(10)(C)(i). We review both of these factual determinations for clear error. *Wasz*, 450 F.3d at 726.

As noted above, there was ample evidence in the record to show that the defendant was an organizer or a leader of this scheme. In conjunction with Jasny, the defendant identified suitable straw buyers and directed their every move, from signing fraudulent loan agreements to assuming false identities. The district court certainly did not err in increasing Radziszewski's offense level by two for his role in the offense. *See* U.S.S.G. § 3B1.1(c) (instructing sentencing courts to increase a defendant's offense level by two if the defendant was an organizer, leader, manager, or supervisor of a criminal activity involving fewer than five participants).

The defendant also challenges the enhancement for the theft and misuse of Marian Plewa's identity. In doing so, however, he does not dispute the fact that Plewa's identity was stolen and used. Nor does he dispute the applicability of the enhancement for "the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification" on this factual record. U.S.S.G. § 2B1.1(b)(10)(C)(i). Indeed, he recognizes that the § 2B1.1(b)(10)(C)(i) enhancement applies when "[a] defendant obtains an individual's name and social security number from a source . . . and obtains a bank loan in that individual's name." *See* U.S.S.G. § 2B1.1, cmt. n.9(C)(ii)(I). His sole argument, then, is that the enhancement should only apply to Filipowicz, the one who actually posed as Marian Plewa.

Given that the defendant directed Filipowicz to pose as Plewa and provided Filipowicz the means to do so, his argument runs counter to logic and reflects a misunderstanding of the Guidelines. The Guidelines specifically provide that in increasing a defendant's offense level based on specific offense characteristics, a sentencing court should consider "all acts and omissions committed, aided, abetted, counseled, *commanded*, induced, procured, or willfully caused by the defendant." U.S.S.G. § 1B1.3(a)(1)(A) (emphasis added). Therefore, by increasing the defendant's offense level because the defendant had directed his associate to assume a false identity, the district court was conforming to the Guidelines' directive, and the district court did not clearly err in applying the identity theft enhancement.

## III.  CONCLUSION

For the reasons set forth above, we AFFIRM the judgment of the district court.

No. 06-1559                                                          13

A true Copy:

    Teste:


                        _____
                        *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*